## COURT OF APPEALS.
### Feb. 26, 1907.

# THE PEOPLE *v.* EDWARD SEXTON.

(187 N. Y. 495.)

**(1). MURDER—CIRCUMSTANTIAL EVIDENCE.**

A defendant indicted for a homicide may be found guilty upon evidence which is wholly circumstantial, and where it appears, upon a review of such evidence, that the uncontradicted and unexplained facts and circumstances, proved upon the trial, not only establish the existence of a powerful motive for the commission of the crime by the defendant, but form so complete and strong a chain of evidence as to exclude, beyond a reasonable doubt, every hypothesis save that of defendant's guilt, a verdict convicting him of murder in the first degree will be sustained.

**(2). TRIAL—CROSS EXAMINATION BY PROSECUTION OF ITS OWN WITNESS.**

While it is the general rule that a party may not impeach his own witnesses, it is not erroneous for the trial court, in the exercise of his judicial discretion, to permit the district attorney, in examining hostile and unwilling witnesses for the prosecution— the wife and daughter of a defendant indicted for a homicide— to ply them with leading questions and even cross-examine them, in order that the whole of the truth may be elicited, especially where such witnesses contradicted none of their earlier statements tending to favor the defendant, but simply reiterated them.

**(3). INDICTMENT—WHEN DENIAL OF MOTION TO DISMISS NOT ERRONEOUS—LEGALITY AND SUFFICIENCY OF EVIDENCE UPON WHICH INDICTMENT IS FOUND—CODE CRIM. PRO. § 313.**

A motion to dismiss an indictment may be made in any case where it is claimed that the legal evidence received by a grand jury is insufficient to support an indictment, or that illegal evidence is the sole basis therefor, for this is a constitutional right notwithstanding the provisions of section 313 of the Code of Criminal Procedure to the contrary; and the right to make such a motion implies the right to have an adverse decision reviewed by the Court of Appeals upon an appeal from a judgment of conviction in a capital case; but where the moving affidavits are vague and unsatisfactory and the court's attention is directed to **no**

illegal evidence that was presented to the grand jury, and the general charge that the evidence was insufficient is supported by no direct or definite statements, a denial of the motion upon the grounds that the evidence was sufficient to sustain the indictment, and that none of the evidence was illegal, will be sustained.

(4).    RECEPTION, BY GRAND JURY, OF THE UNSWORN TESTIMONY OF INFANTS UNDER TWELVE YEARS OF AGE—WHEN EXAMINATION AS TO INTELLIGENCE OF SUCH WITNESSES BY GRAND JURY IS SUFFICIENT COMPLIANCE WITH LAW—CODE CRIM. PRO. § 392.

The fact that two of the witnesses, who were examined before the grand jury, were children under the age of twelve years, although they were neither sworn nor examined as to their intelligence, pursuant to the statute (Code Crim. Pro. § 392), by the justice who presided at the term during which the defendant was indicted, does not affect the validity of the indictment, where the justice, before whom a motion to dismiss was made, and who examined the minutes of the grand jury decided that there was sufficient other evidence to sustain the indictment; but where it appears from the affidavit of the district attorney, upon the motion to dismiss the indictment, that the statute was literally complied with in the examination of the children before and by the grand jury, such examination is a sufficient compliance with the statute, since a grand jury, although a part of the court with which it is convened, is a distinct body clothed with authority to conduct the examination of witnesses in any way that does not conflict with established legal rules; and, as the statute (Code Crim. Pro. § 392) authorizing the unsworn testimony of children under twelve years of age is not in derogation of any constitutional right of a citizen, the grand jury has the power to determine for itself the qualifications of such witnesses so long as there is due observance of the statutory safeguards enjoined upon other tribunals in similar circumstances.

APPEAL from a judgment of the Supreme Court, rendered April 29, 1904, at a Trial Term for the county of Ontario, upon a verdict convicting the defendant of the crime of murder in the first degree.

*Royal R. Scott* for appellant. It was improper and illegal to permit the district attorney to cross-examine and impeach his

own witnesses. (*Sanchez* v. *People,* 22 N. Y. 148; *Town of Ontario* v. *Union Bank,* 21 Misc. Rep. 770; *Hankinson* v. *Van Tine,* 152 N. Y. 20; *Morris* v. *Wells,* 26 N. Y. S. R. 9.) The map was improperly admitted in evidence, and its admission over defendant's objection was clearly prejudicial to defendant. (3 Rice on Ev. 154; *People* v. *Buddensieck,* 103 N. Y. 490; *People* v. *Fish,* 125 N. Y. 147; *Cowley* v. *People,* 83 N. Y. 466; *Marble* v. *McMinn,* 57 Barb. 610; *Curtis* v. *Ayrault,* 3 Hun, 487; *Dederich* v. *S. L. C. R. R. Co.,* 35 L. R. A. 802; *Rodriquez* v. *State,* 32 Tex. Cr. 259; *Johnston* v. *Jones,* 66 U. S. 209; *Dunn* v. *Hayes,* 21 Me. 276.) The order denying defendant's motion to dismiss the indictment was erroneous and said motion should have been granted. (*People* v. *Price,* 6 N. Y. Cr. Rep. 141; *People* v. *Clements,* 5 N. Y. Cr. Rep. 288; *People* v. *Briggs,* 60 How. Pr. 17; *People* v. *Glen,* 173 N. Y. 395; *People* v. *Restenblat,* 1 Abb. Pr. 268; *People* v. *Hyler,* 2 Park. Cr. Rep. 570; *People* v. *Petrea,* 1 N. Y. Cr. Rep. 198; *People* v. *Sellick,* 4 N. Y. Cr. Rep. 329; *People* v. *Haines,* 6 N. Y. Cr. Rep. 100; *People* v. *Brickner,* 8 N. Y. Cr. Rep. 217.)

*Robert F. Thompson* for respondent. A witness unexpectedly hostile may be contradicted and impeached. (Underhill on Crim. Ev. 262; *People* v. *Kelly,* 113 N. Y. 647; *Vollkommer* v. *Cody,* 177 N. Y. 129; *Maloney* v. *Martin,* 81 App. Div. 432.) The map was properly admitted in evidence. (*People* v. *Rimieri,* 180 N. Y. 163.) The order denying defendant's motion to dismiss the indictment was not erroneous and Justice DAVY's decision was right. (*People* v. *Diamond,* 72 App. Div. 281; *People* v. *Johnson,* 185 N. Y. 219.) The grand jury has the power, by virtue of section 392 of the Criminal Code, to decide whether a child is of sufficient understanding to comprehend the nature of an oath. (*People* v. *Willis,* 23 Misc. Rep. 573; *People* v. *Farrell,* 20 Misc. Rep. 219; *People* v.

*Wynant,* 24 Misc. Rep. 361; *People v. Dorthy,* 50 App. Div. 50; *People v. Naughton,* 7 Abb. [N. S.] 421; *Hackley Case,* 21 How. Pr. 53; *Matter of Chote,* 8 N. Y. Cr. Rep. 7; *People v. Molineux,* 27 Misc. Rep. 79; *Eighmy v. People,* 79 N. Y. 546; *People v. Proskey,* 37 Misc. Rep. 367; *People v. Strivart,* 47 Misc. Rep. 252.) The district attorney did not make improper statements to the prejudice of defendant during the trial nor in his summing up. (*People v. Doody,* 172 N. Y. 166; *People v. Flannigan,* 156 N. Y. 366.)

WERNER, J.:

On the 23d day of June, 1903, the dead body of Thomas Mahaney, Jr., was found in a field which was part of a small farm occupied by him, his wife and their children, in the town of Farmington, in the county of Ontario. The deceased had plainly been killed by some person armed with a shotgun loaded with No. 6 shot, for in his left temple there was a large wound filled with shot of that size, surrounded over a circumference of about two and one-half inches with somewhat scattered perforations caused by the same kind of missiles, many of which had passed through the temporal bone and penetrated the brain. Suspicion pointed to the defendant as the perpetrator of the foul deed. He was arrested and indicted upon the charge of murder in the first degree. His trial and conviction followed and he has now appealed to this court. The case of the prosecution rests wholly upon circumstantial evidence, in which the element of motive is an important factor. The principal question we have to consider is whether the circumstances arrayed against the defendant form so complete and strong a chain of evidence as to exclude beyond a reasonable doubt every hypothesis save that of his guilt. As that necessitates a recital of the essential features of the evidence submitted to the jury, it may conduce to clearness and brevity of statement if we begin the narrative with the earliest mention of the relations of the

decedent and the defendant toward each other, and then continue it chronologically down to its tragic ending.

The story begins at a period preceding the year 1895 when the decedent, then a youth of eighteen, resided with his parents on a small place near the scene of the homicide, and the defendant and his wife and children lived on the premises which they occupied at the time when the defendant was charged with the commission of this crime. We are not informed as to the character or extent of the relations between these two men at that early period, beyond what may be inferred from their proximity of residence in a rural community. In 1894 the defendant had been convicted of some criminal offense for which he had been sentenced to serve a term of one year in the penitentiary. Upon his release from incarceration at some time in 1895 he returned to his home, and soon thereafter was again arrested at the instance of his wife upon the charge of assault. At the trial upon that charge, which took place before a justice of the peace and a jury, the defendant conducted his own defense and sought to justify or palliate the alleged offense with the countercharge that during his previous incarceration his wife had been guilty of criminal intimacy with young Mahaney, the deceased, with the result that she was then pregnant, and to prove his assertion he compelled her to rise in the presence of the jury and pointed out her condition. In conversation with one Rush, a farmer by whom the defendant was employed at that time or soon thereafter, the latter told the former that "when he came out of the workhouse his wife admitted to him that she was in the family way, and Thomas Mahaney was the father of the child, and he said he was going to kill him, if he didn't kill him within ten years." At about that time the defendant also told one Rogers that the deceased was responsible for his wife's condition; that he had been running everywhere with her during the defendant's absence, and that he would " shoot the s—— of a b——." In the spring of 1898 the defendant applied to McLouth, the

justice, for a peace warrant against the deceased, stating that the latter "abused him and wouldn't allow him to go in the road; that when he went anywhere he had to go cross lots; he didn't dare go in the road; he was afraid of him." Later in the same year the defendant was arrested for an alleged assault upon one Morris Mahaney. At that time he stated to the same justice of the peace "that Tom (the deceased) was the cause of all that trouble;" that he had sent Morris over to the defendant's place to break the windows so that the defendant would commit an assault upon Morris and then be arrested for it.

In January, 1900, the deceased was married to Mary Shea. The young couple at once took up their abode in the city of Rochester and remained away from Farmington until the fall of 1902, when they returned to reside upon the place where the deceased met his death. The record is silent as to this interval of about four years, until the deceased and his wife were about to return to Farmington in October, 1902, when the defendant had a conversation with one Ebert in the fruit evaporating establishment of one Johnson. Ebert stated that it was reported that the deceased was about to return to Farmington, when the defendant said, "By God, if he comes back there I will put him out of the way," to which Ebert replied, "You had better keep your hands off from Tom, he's a pretty good man," and the defendant rejoined by saying, "I don't intend to put my hands on him to put him out of the way."

About a month before the deceased and his wife went back to Farmington, the elder Mahaney, father of the deceased, had a talk with the defendant. The latter said, "I hear Tom is coming back to live in the neighborhood; you tell Tom by God Almighty, if he ever comes to that street again, he won't last but a little while, and you be sure and tell it to him." The deceased and his wife returned to Farmington and took up their abode on the place where the former met his death. After

they had lived there about four weeks the latter heard the defendant talking in the road. It was near midnight and was dark, so that she could not see him, but she knew his voice. She heard him say, " Mahaney, I will lay for you; I will serve twenty years for you; you're before me," or that in substance. ·At about this time the defendant went one evening to the house of Mrs. Mahaney, the mother of the deceased. He was intoxicated and, referring to the circumstance that the deceased had been a witness against him upon his trial for assault upon Morris Mahaney, he said he would " meet him some day for what he had done." Then there was an occasion when the defendant had a conversation at his home with one Nicholson, in which the former is quoted as saying that he would " take the liver and heart out of that man " (referring to the deceased) " and whittle it away as easily as he could whittle the stick that he held in his hand." Substantially of the same purport was another conversation between the defendant and the Brodericks, husband and wife, in which the defendant is charged with saying, " Tom Mahaney is a perjurer and he could take his knife and cut out his heart and chew it."

Coming down to a period about ten days before the homicide, the wife of the deceased testified that the defendant came home from town one night and his wife came out of the house to assist him in unhitching the horse. On that occasion she heard the defendant say " he had the ammunition to fix Mahaney now, and there were others he would fix with him; two or three others." That the defendant's wife spoke to him and told him to keep still, and he replied, " no, he wouldn't; he would fix him; he would shoot him." At about this same time the defendant, in a conversation with one Johnson, said that certain persons were meddling with his things and taking some of them, and he mentioned the names of Welch, John Mahaney and the deceased, saying: " They will find some one dead here if this thing continues."

A few days before the homicide the defendant, in a conversation with the Cornelius, father and son, said to the latter, " you are afraid of Tom Mahaney," and upon receiving a reply in the negative he said, " I will do away with the black cuss.  I will do away with the black s—— of a b——."

We now pass to the consideration of the events of the fatal day.  The defendant and his wife drove to Canandaigua.  The time of their going and the duration of their stay is not definitely shown.  They seem to have been there as late as between two and three o'clock in the afternoon, for Kelly, a saloon-keeper, says the defendant was at his place at that hour somewhat under the influence of liquor.  Behrens and the two Cornelius, who were at work in a gravel pit near the homes of the Mahaneys and the Sextons, saw the defendant and his wife driving homeward a few minutes after four o'clock.  The defendant's wife testified that they reached their house at about five o'clock, and this statement is corroborated by the daughter Anna, who assisted in unhitching the horse.

Here we pause to take up the movements of the deceased as disclosed by the record.  He had been at work earlier in the day " drilling in " beans for farmer Edmonston, and returned home about three o'clock, bringing with him the latter's drill and drag and his own team.  He started at once to " drag " a field that lay westerly from his house, leaving the drill at the barn.  Having finished his " dragging," the deceased returned to the house where his wife had been picking over beans that were to be " drilled " into the ground that had been prepared for them.  He partook of a lunch, changed some of his outer clothing, hitched his team to the " drill " which had been filled with beans brought from Edmonston's, and then went back to the field, beginning to drill in the southwesterly corner where the westerly line, which separates the premises of the deceased from those of the defendant, runs on an angle that required the " drilling " of a number of short rows of varying lengths before

this planting process could be continued in rows extending north and south from one end of the field to the other. The "drill" had been driven back and forth on these short rows four times and had been turned at a point as near as possible to the west fence of the deceased, when the shot was fired which caused his death, and the team started for the barn on a fast trot. This was at about five-thirty in the afternoon.

At this juncture it will be desirable to take a more critical view of the scene of the crime and its surroundings. The premises occupied by the deceased and his wife consisted of between five and six acres of land fronting on a road running north and south between Canandaigua, in the county of Ontario, and Palmyra, in the county of Wayne. Next north and fronting on the same road were the premises of the elder Mahaney, consisting of ten or twelve acres, and flanked on the north by a road running east and west. The premises of the defendant were next south of the premises of the deceased, fronting on the north and south road, extending westerly to the westerly line of the premises of the two Mahaneys, father and son, and from thence continuing southerly on an obtuse angle to the east and west road above mentioned, thus bounding the premises of the deceased both on the south and west. That portion of the defendant's lands which lay westerly of those occupied by the deceased consisted wholly of swamp, with the exception of a knoll about fourteen rods square, which had been planted with strawberries. The place where the body of the deceased was found is near the line which forms the western boundary of his premises and the eastern boundary of the land of the defendant. Along the line of the fence marking this boundary there are some bushes and a few swamp trees, which obstructed the view between the Mahaney land, where the body of the deceased was found, and the strawberry patch on the defendant's land. At a point six feet west of where the body of the deceased was found and fifteen inches

2

west of this boundary fence there stood upon the defendant's land a small tree overgrown with young vines.

The gunshot report above referred to had been heard by a number of persons. One of these, Bertha McCauley, who lived to the northwest of the *locus in quo,* was picking cherries at that time. She saw the defendant coming down the path toward the swamp. Within fifteen minutes of her first sight of him she heard the report of a gun and then she saw Mahaney's team running towards the barn. At the coroner's inquest the defendant admitted that he had last seen the deceased alive at about five-thirty in the afternoon before, which was the day of the shooting; that the deceased was then " drilling " on the west side of his lot, and that he, the defendant, was then at the berry patch on his premises. The defendant's daughter saw him going toward the berry patch, and this is corroborated by his wife, although both of these witnesses say the defendant was carrying a berry crate, while that is denied by the witness McCauley who says she saw nothing in the defendant's hands. The defendant's daughter thought her father had returned to the house before she heard the shot, and at the coroner's inquest the defendant's wife testified that in the course of about one-half hour after she and her husband had returned from Canandaigua, the latter came into the house, when she asked him if he had heard a shot, to which he replied in the negative, and then he asked her if she had heard one, to which she said she had.

Meanwhile the wife of the deceased, having finished her task of picking over beans, started to take them out to the barn. There she saw the driverless team. In the same instant Mrs. Mahaney, the mother of the deceased, came along, and a search was instituted which resulted in the finding of the body of the deceased at the place above indicated. The body lay on the stomach, with the left side of the face and head upon the ground in a pool of blood. The left temple had been shattered by a

volley of shot, well bunched, most of them penetrating the superficial structure of the skin, and many more passing into and through the membrane of the brain. One hundred of these missiles were within an area of about two and one-half inches, extending from the top of the nose to the last posterior shell of the ear, and there were others scattered in the face, neck and scalp. The left eye had been punctured and a large portion of its contents had leaked out. The cause of death was plainly visible and unmistakable. The tree, above referred to as standing upon the land of the deceased at a point about fifteen inches from the barbed wire line fence and in a direct line between the strawberry patch and the place where the deceased had paused to turn his drill, had been perforated with shot, covering a space of about 65-100 of a foot in size, which was about five feet four inches from the ground, and the vine which clustered about the tree had been cut off at the same place.

The news of the tragedy spread rapidly, and soon the neighbors within a radius of half a mile or more gathered in the stricken home, but the Sextons, next door neighbors, were not there. At about seven o'clock in the evening Mrs. Behrens, who had been at the Mahaneys since the discovery of the tragedy, went after the Welchs, who were also neighbors. In going she passed the defendant who asked her what was the matter, to which she replied " nothing much," and in returning from the Welchs the party met the defendant who said to Welch, " Ed, don't go there." Later that night, at about eleven o'clock, when some of the neighbors were still at the Mahaneys, the defendant went to the home of Cornelius, who asked the defendant what he wanted, to which the latter replied, " Have you seen my wife ?  She is crazy, she is throwing things around the house, and has stole my gun and is shooting, shooting everybody. You know I have got a baby to nurse, come out and help me in my trouble." Half an hour later he appears at the door of the Mahaneys. A Mrs. Hughes, who

was there, heard some one muttering outside of the house and went to the door where she found the defendant, who said, "I want my wife," and upon being told that she was not there he left the house. This is corroborated by the widow of the deceased, who heard Mrs. Hughes talking to some one to whom she said, "you are not wanted here." The significance of this testimony becomes apparent when we refer to the evidence of the defendant's wife, to the effect that after her return from Canandaigua she did not leave her house again that day.

Having thus outlined the salient circumstances and events which preceded and surrounded the homicide, it yet remains to summarize the circumstances bearing upon the character and ownership of the weapon by means of which the death of Mahaney is thought to have been effected. That Mahaney's death was caused by a shot from a gun loaded with No. 6 shot cannot be doubted. The character of the wound, the number and nature of the missiles found in the body, and the perforations and abrasions upon the tree and vine referred to, all preclude the possibility of any other hypothesis. That the defendant had possessed a shotgun as late as two weeks before the homicide can hardly be doubted, for his wife testified to that effect. She said it had disappeared about that time with a razor and some other articles, and both Mr. and Mrs. Lawrence say the defendant told them the same story. Behrens had seen the defendant engaged in shooting with a shotgun back of the Cornelius barn a week or two before the homicide, and this is corroborated by the younger Cornelius, who says it was the same gun which he had frequently seen in the defendant's possession; that it was a twelve-gauge gun for which he at one time purchased some No. 6 shot at defendant's request. It also appears that the defendant borrowed a rifle from Mr. Lawrence about two weeks before the homicide, but it had been returned at least two days before that event. After the homicide some empty twelve-gauge shells were found in the swamp and at

other places on the defendant's premises. On the morning after young Mahaney's death his father found a twelve-gauge gun wad a little to the east of where the body had lain, and other gun wads of the same size were later found a foot or so west of the tree which had been perforated with shot. The gun which the defendant had owned was not found, and was not accounted for at the trial, except as stated in the testimony of the defendant's wife and of Mr. and Mrs. Lawrence.

Thus we have a story containing, in varying degree, the different elements which are essentials in a case of circumstantial evidence. A powerful motive, fed and fostered by the periodical recollection and recital of the decedent's supposed invasion of the defendant's connubial bed—a wrong which no man can ever forget and which few have ever attempted to forgive—; a series of bitter denunciations and threats of violence against the deceased by the defendant, beginning soon after his discovery of the reputed liaison between his wife and the deceased, and continuing until the marriage of the latter and his removal from the neighborhood; a renewal of these denunciations and threats when it was reported that the deceased had decided to come back to the neighborhood, and again continued practically down to the fatal day, under circumstances indicating that this was the subject uppermost in the defendant's mind when his passions were inflamed by indulgence in intoxicating liquor; the sudden and mysterious disappearance of the shotgun which the defendant had owned and openly possessed for a long time down to within two weeks of the homicide; the defendant's trip to Canandaigua on the day of the homicide and his return home somewhat the worse for liquor; his presence in the swamp lot at the time of the shooting when he and the deceased were separated by only a few rods of space and no other human being was near; the firing of the deadly charge and its train of indications pointing to the locality where the defendant was seen as the spot from

whence the shot had proceeded; the defendant's aloofness and apparent indifference during the hours following the tragedy, when all the other neighbors of the bereaved family had gathered to assist and comfort them; his later visits that night to the homes of Cornelius and the deceased, pretending to be in search of his wife, who was then under his own roof where she had been every moment since the shooting; and his statement to the effect that his wife had stolen his gun and was threatening to shoot everybody, although he had said to the Lawrences two weeks before the homicide that his gun had disappeared. These facts and circumstances, uncontradicted and unexplained, were submitted to a jury of the defendant's peers, under a charge so fair and favorable that no exception was taken, and a verdict of guilty was rendered. After a most careful and searching scrutiny of this array of facts and circumstances, we find ourselves unable to assent to the appellant's contention that they are insufficient to sustain this judgment of conviction. The chain is not equally strong in all its parts, but it is so connected that we think it was competent for the jury to decide that, beyond every reasonable doubt and to the exclusion of every other hypothesis, the defendant was the guilty slayer of the defendant. With that decision, resting upon such a foundation, we have no power to interfere, unless the defendant's substantial rights have been injuriously affected in the conduct of the trial.

The learned counsel for the appellant has very ably presented for our consideration various objections, exceptions and alleged irregularities in the trial as grounds for the reversal of this judgment of conviction. Addressing ourselves first to his criticism that the general attitude of the learned trial justice, as evidenced by his rulings, his charge and his indulgence of the district attorney, was calculated to influence the jury against the defendant, we deem it no less a pleasure than a duty to say that rarely are we called upon to decide an appeal in a capital

case in which there is so little to criticise upon these grounds. We have had frequent occasion of late to deprecate the methods employed by some district attorneys in criminal trials, and to disapprove of the complacency of some trial judges in dealing with the most obvious misuses of a public prosecutor's official prerogatives and powers. It is quite natural that the discussion of such matters in the opinions of courts should sometimes suggest to the members of the profession the idea of raising similar questions in cases where an impartial judicial examination will disclose but little to criticise and nothing to condemn. In such instances we should be no less willing to express our approval than we are in other circumstances to publish our denunciation of what is unfair, unprofessional or unjust. Applying this rule to the case at bar, we feel bound to say that we are impressed by the evident fairness and impartiality of the presiding justice. There was nothing in his attitude or rulings, as disclosed by the record, that suggests the slightest bias, and his charge to the jury was so judicial, so comprehensive and so free from error as to evoke no exception from a defendant's counsel whose zeal and learning have uncovered every possible point in the case. Nor can we find any just ground for unfavorable criticism of the district attorney's conduct of the trial. While a prosecuting officer is vested with some quasi-judicial powers which, in these days, are unfortunately quite as often honored in the breach as in the observance, we must not forget that the prosecution of crimes cannot be conducted in the carefully weighed and measured language of judicial opinions. The precise latitude within which prosecutions may properly be presented cannot be circumscribed by any exact standard, for no two cases are alike, and the courts have neither power nor inclination to regulate the manners and methods of district attorneys, so long as they do not openly offend against professional propriety or interfere with the due and orderly administration of criminal justice. We think that when the

prosecution of the case at bar is subjected to the test of this necessarily flexible rule, it is but simple justice to say that the district attorney was no more zealous and no less judicial than he had a right to be.

The specific assignments of error urged upon our attention may be disposed of with a very brief discussion. It is said that the district attorney was permitted to cross-examine and impeach his own witnesses, the defendant's wife and daughter. The reason of the rule upon which that contention is based suggests the exceptions that are necessary to its practical application. The party who calls a witness, certifies his credibility. Therefore, a witness may not be impeached by the party at whose instance he testifies. This general rule is subject, however, to the exception that, when a witness proves hostile or unwilling, the party calling him may probe his conscience or test his recollection, to the end that the whole truth may be laid bare; and the extent to which this may be done depends upon judicial discretion exercised in the light of the circumstances in which the question arises. That these two persons, wife and daughter of the defendant, were ·unwilling witnesses against him was manifest from their relations to him and from their apparent lack of recollection. It was, therefore, permissible for the district attorney to ply them with leading questions, and even to cross-examine them. (*Becker* v. *Koch,* 104 N. Y. 401; *People* v. *Kelly,* 113 N. Y. 647, 652, 7 N. Y. Crim. Rep. 40.) It is to be observed, moreover, that the question is really academic, for these witnesses contradicted none of their earlier statements tending to favor the defendant, but simply reiterated them.

It is said that a map purporting to show the *locus in quo* was improperly admitted in evidence. The specific complaint in that behalf is that the map contained certain red lines designed to represent the path followed by the defendant in going from his house to the scene of the homicide. The answer to

this objection is that, although the general features of the map were verified by the examination of the surveyor who made it, there is not a word of testimony in the record to indicate what these red lines referred to. They are not identified or characterized on the map itself, and no one examining it could form any definite idea as to the meaning or purpose of these lines. It may be added, also, that even if it were admitted that these lines indicated the path pursued by the defendant, that circumstance would add nothing to the probative force of the People's evidence, since the defendant's presence in the strawberry patch at about the time of the homicide was proven out of his own mouth at the coroner's inquest and established upon this trial by the duly authenticated minutes of that proceeding.

It is also claimed that the learned trial court erroneously refused to permit defendant's counsel to cross-examine the People's witness, Jacob Cornelius, from the minutes of his evidence given at the coroner's inquest. It appears that the coroner, while a witness before the grand jury, inserted in his coroner's minutes the name "Thomas Cornelius, Jr.," upon a page which, but for such interlineation, would seem to have contained a continuation of the evidence of Jacob Cornelius given at the inquest. At the trial, during the cross-examination of this Cornelius, defendant's counsel put some questions to him which assumed that the statements appearing upon that part of the minutes referred to the evidence that had been given by him before the coroner. The witness was a Dutchman, illiterate and ignorant, and the examination had become badly involved, when the question arose whether that portion of the coroner's minutes referred to contained his evidence or that of Jacob Cornelius, Jr. This was the situation when the court intervened with the suggestion that the defendant's counsel could ask the witness about anything that he was understood to have testified to before the coroner, "but it is not fair to assume that he did make the statements before the Coroner

that are under the name of Jacob Cornelius, Jr.   You may ask him, however, if he made those statements in view of the fact of these corrections." While the confusion caused by the coroner's interlineation of the name " Thomas Cornelius, Jr.," in his minutes does not appear to have been very satisfactorily cleared up, it is evident from the trial court's concluding sentence above quoted that the defendant's counsel was in fact not deprived of any opportunity to cross-examine Jacob Cornelius. The only limitation imposed by the court was one that seems to have been proper under the circumstances, and we, therefore, conclude that this ruling was not erroneous or prejudicial to the defendant.

It is further urged that the defendant was deprived of a substantial right in the denial of his motion to dismiss the indictment upon which he was tried.   This motion was made, not at the trial of the defendant, but at a previous term of the court held by Mr. Justice DAVY, and upon three separate grounds:   1. That improper and illegal evidence was introduced before the grand jury.   2. That the statements of two unsworn witnesses were received by the grand jury without any effort by the court to ascertain whether these witnesses, being children under twelve years of age, understood the nature of an oath, and, if not, whether they were possessed of sufficient intelligence to justify the reception of their evidence.   3. That the legal evidence produced before the grand jury was insufficient to warrant the finding of an indictment.   Neither of the grounds upon which this motion was made is recognized by the Code of Criminal Procedure (Sec. 313) as a sufficient reason for setting aside an indictment; but in the case of *People* v. *Glen* (173 N. Y. 400, 17 N. Y. Crim. 225), we had occasion to pass upon the validity of that section.   It was there decided to be clearly within the legislative power to restrict the grounds upon which such a motion could be made, so long as the restraint imposed related solely to matters of practice or pro-

cedure, but that the section referred to was not intended to affect, and could not curtail, any of the constitutional rights of an indicted defendant. At least two of the grounds upon which the motion was made to dismiss the indictment herein do relate to the defendant's constitutional rights, for a grand jury can receive none but legal evidence (Code .Crim. Pro. sec. 256) and should only find an indictment when all the evidence, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by a trial jury. (Code Crim. Pro. sec. 258.) Whenever . it clearly appears, therefore, that the legal evidence received by a grand jury is insufficient to support an indictment; or that illegal evidence is the sole basis for an indictment, the person indicted has a constitutional right to make a motion to dismiss, notwithstanding the provisions of the Code to the contrary. The right to make a motion upon these substantial grounds, and to have it decided in the first instance, necessarily implies the right to have a review of an adverse decision, at least in the absence of any statutory limitation, and so we will treat this as one of the questions that may be reviewed by this court upon appeal from a judgment of conviction in a capital case. While this somewhat extended preliminary discussion of the question is pertinent upon the defendant's right to have a review of the denial of his motion to dismiss the indictment, it is really of little practical importance when considered in the light of the record. The averments of the affidavits upon which the motion was made were vague and unsatisfactory. The court's attention was directed to no illegal evidence that was presented to the grand jury, and the very general charge that the evidence was insufficient is supported by no direct or infinite statement. In short, the moving affidavits are simply a collection of the broadest generalizations stated upon information and belief. The learned trial justice before whom the motion was made had the minutes of the grand jury before him. He decided that the

evidence was sufficient to sustain the indictment, and that none of the evidence was illegal. That decision is clearly supported by the record before us, and it is also fortified by the presumption that an indictment is found upon legal and sufficient evidence. (*People* v. *McIntyre,* 1 Parker's Cr. Rep. 372; *U. S.* v. *Wilson,* 6 McLean, 611.)

There is yet another phase of the motion to dismiss the indictment that needs to be briefly considered. It is said that two of the children of the defendant, one of them nine years of age and the other only six, were witnesses before the grand jury, although they were neither sworn nor examined by the justice who presided at the term during which the indictment against the defendant was found. The Code of Criminal Procedure (Sec. 392) provides that " whenever in any criminal proceedings a child actually or apparently under the age of twelve years offered as a witness does not in the opinion of the court or magistrate understand the nature of an oath, the evidence of such child may be received though not given under oath if, in the opinion of the court or magistrate, such child is possessed of sufficient intelligence to justify the reception of the evidence. But no person shall be held or convicted of an offense upon such testimony unsupported by other evidence." As we understand the argument of the learned counsel for the appellant it is, in substance, that the evidence of these children could not legally be received by the grand jury until after such a preliminary examination as is provided for in section 392, and that no one had the right to make that examination but the justice who presided at that term of court. If we assume for the instant the soundness of counsel's contention, that does not affect the validity of the indictment. The justice before whom the motion to dismiss was made and who examined the grand jury's minutes decided that there was sufficient other evidence to sustain the indictment. That is in accord with the general rule which is well expressed in Underhill's work on

Criminal Evidence (Sec. 26), as follows: " The fact that some incompetent evidence was received in connection with competent evidence, or an incompetent witness examined, is not ground for quashing an indictment, for these errors may be corrected upon the trial." But we do not think it is necessary to dispose of the question upon this last-mentioned ground. A grand jury, although for some purpose a part of the court in connection with which it is convened, is in some aspects a separate and independent tribunal, free from the restraint of the court, and at liberty to decide upon its own methods of procedure in so far as they are not controlled by statute or immemorial usage having the force of law. One of the attributes and powers of this independent existence is to decide when and in what order witnesses shall be called, and, to some extent, who shall be called. For all the ordinary purposes of procuring evidence a grand jury is a distinct body clothed with authority to conduct the examination of witnesses in any way that does not conflict with established legal rules. The court has no general control over witnesses summoned before a grand jury except to punish them for contumacy or contempt, and we cannot see upon what theory it could be held that a grand jury has not the power to determine for itself the qualifications of witnesses of tender years so long as there is due observance of the statutory safeguards enjoined upon other tribunals in similar circumstances. It requires no violent stretch of language or of legal rules to apply the terms of the statute (Code Crim. Pro. sec. 392) to grand juries as well as to courts and magistrates, and when that is done it ends the discussion here, for we are informed by the district attorney's affidavit that the statute was literally complied with in the examination of these children. The statute authorizing the reception of the unsworn testimony of children under twelve years of age is not in derogation of any constitutional right of a citizen. (*People v. Johnson,* 185 N. Y. 228, 20 N. Y. Crim. 109.)

Other matters are pressed upon our attention by the able and zealous counsel for the appellant, but we do not regard them as of sufficient importance to justify the further continuance of this discussion. Having reviewed this case with a full realization of the solemn responsibility that attends an issue of life and death, our duty compels us to decide that the evidence is sufficient to support the judgment of conviction herein, and that the record discloses no errors which will warrant the reversal of that judgment.

CULLEN, Ch. J., GRAY, HAIGHT, WILLARD BARTLETT and CHASE, JJ., concur; VANN, J., not voting.

Judgment of conviction affirmed.