# SUPREME COURT — APPELLATE DIVISION — FIRST DEPARTMENT.

## July 14, 1922.

## THE PEOPLE v. ROCCO CARNAVALLE.

(202 App. Div. 156.)

(1) MURDER, SECOND DEGREE—WITNESSES—ERROR TO PERMIT PROSECUTION TO IMPEACH OWN WITNESS ON REDIRECT EXAMINATION THOUGH PROSECUTION IN OPENING STATED THAT WITNESS HAD BAD CHARACTER.

On a prosecution for murder it was error to permit the district attorney, on redirect examination of a witness for the People who had disappointed him in her testimony as to a material and vital question in the case, to impeach her credibility by severe cross-examination tending to show that she was a woman of immoral character and had been convicted of crime on several occasions, though the district attorney in his opening statement to the jury referred to the witness in a way which indicated that he did not believe that she would tell all the truth, but he did not on the opening of her testimony make any attack on her character or credibility, save to show that she had not been living with her husband for several years, and that she had been intimate with the defendant.

(2) SAME—EVIDENCE NOT ADMISSIBLE ON THEORY OF SHOWING WITNESS' PAST HISTORY TO ENABLE JURY TO DETERMINE CREDIBILITY.

Such evidence was not admissible on the theory of showing the witness' past history in order to enable the jurors to determine the extent to which they should give credit to her testimony.

LAUGHLIN and MERRELL, JJ., dissent, with memorandum.

APPEAL by the defendant, Rocco Carnavalle, from a judgment of the Supreme Court, rendered on the 24th day of June, 1915, convicting him of the crime of murder in the second degree.

*Lloyd Paul Stryker,* of counsel (*Aiken A. Pope,* with him on the brief), for the appellant.

*Joab H. Banton, District Attorney* (*John Caldwell Myers, Assistant District Attorney,* of counsel; *George N. Brothers,*

*Assistant District Attorney,* and *Felix C. Benvenga, Deputy Assistant District Attorney,* with him on the brief), for the respondent.

DOWLING J.:

The appellant herein was convicted of the crime of murder in the second degree, having been indicted jointly with Gaetano Montimagno and Frank Finnemore for murder in the first degree for the killing of Michael Giamari, who was shot and killed on March 8, 1915, at the corner of Madison and Chestnut streets, in the borough of Manhattan, city of New York. The defendants were tried separately. The shot that killed Giamari was fired by Montimagno. The appellant did not participate in the actual shooting. He was indicted and convicted on the theory that he induced or procured Montimagno to shoot and kill Giamari. He does not dispute the fact that Giamari was killed by Montimagno, but does contend that he did not participate in any way in the commission of the crime.

The evidence was sufficient to warrant the verdict of the jury finding the defendant guilty, but it is unnecessary to analyze it, in view of the conclusion we have reached as to the errors claimed to have been committed upon the trial.

The first, and most serious, of these arises in connection with the examination of the witness, Pauline Samuels. She was questioned as to visits of Frank Finnemore, Gaetano Montimagno, and Joseph La Salle to her rooms at 5211 New Utrecht avenue, Brooklyn, where she was living with defendant as his mistress. She was also interrogated as to a burglary attempted to be committed at 19 Catherine street (where defendant also was living with her), when he had a " gun " in his hand, which she described as a little one, measuring by her estimate about seven inches, which she had never seen before. She also saw a " gun " belonging to defendant at the Brooklyn house, but could not say if it was the same one; that it did not look the

same; but she had told the grand jury it was the same weapon. She testified that the revolver she had seen was not like the exhibit in the case, with which the murder was committed, which was a forty-one calibre Colt revolver, but was much lighter in weight. She admitted that defendant had a pistol, which he kept under his pillow in the Brooklyn house, where she saw it daily when she made up the bed they occupied together, and that she saw it there until a few weeks before she moved to Manhattan on March 22, 1915, when she missed it and saw it no more. The murder was committed on March 8th, two weeks before she moved. She was interrogated at considerable length about the identity of the pistols she had seen in defendant's possession with the one with which the murder was committed, for it was the theory of the prosecution that the killing had been done with defendant's pistol, which he had furnished when he induced Montimagno to do the actual killing.

The witness Samuels was a necessary and most material witness for the prosecution. It was sought to show by her that the revolver used by Montimagno in the shooting of decedent belonged to defendant and had been in his possession for a considerable time prior thereto, disappearing from its usual place under defendant's pillow at night just prior to the killing. This, if proven by her testimony, would have gone far to sustain the theory of the prosecution as to defendant's guilt. Joseph La Salle had testified that the pistol used in the killing belonged to defendant, and he had seen it in his possession for about five years prior to the trial, and in February had seen it at the Brooklyn house in defendant's possession, when defendant told Montimagno: " This is the pistol that you got to shoot Mike Giamari with," and when Montimagno asked him if the pistol worked all right, defendant replied: " Yes, I tried it New Year's morning and it worked correct." La Salle also had a thirty-two Colt magazine pistol there at the time. Antonio La Salle also had testified that he saw the pistol, with

which the murder was committed, in defendant's possession on many occasions; that he carried it in the inside of his pants and the witness had seen him pull it out on several occasions and display it. Defendant told him it was a "gun" from Chinatown, which a policeman gave him after a "battle" there. But Antonio La Salle at the time of the trial was serving a sentence of from twenty years to life in State prison, having been convicted of murder in the second degree for the killing of James Minott on January 1, 1915, and Joseph La Salle, his brother, having been a witness for him on his trial, pleaded guilty to murder in the second degree for his complicity in the same crime, and was sentenced to the same imprisonment on April 13, 1915. With the character of these witnesses in mind, corroborative evidence of defendant's ownership of the revolver became essential, for a jury would hesitate to accept their unsupported testimony, so that the favorable testimony of Samuels became vital to the prosecution.

Further, Joseph La Salle had testified to very important statements made by defendant in several conversations with him at the Brooklyn house in the presence of Finnemore and Samuels, at one of which Montimagno was present. These statements, if believed to have been made, were conclusive as to defendant's guilt. Neither Montimagno nor Finnemore was called as a witness by the prosecution, so that the only other person present at the conversation, Samuels, who could have corroborated La Salle, was a witness for the People, but did not in fact furnish such corroboration, though it was vital that it should have found support in some other testimony than that of an admitted murderer.

Thus, Samuels being a necessary and material witness, the assistant district attorney in his opening said: "We are going to call this woman Samuels. She has known Rocks Cornell for seven or eight years. Now, because of their relations, their peculiar relations, it makes it almost impossible to believe that

we could get all the truth from her. Yet, unwilling as she appears to be as a witness, she will tell you that this man Montimagno, whom she knew as ' Tommy,' came to her house, and she saw him there. She will tell you that Rocks Cornell had a pistol; that he kept it under her pillow; that she moved from that flat on the 22d of March, 1915. That is twelve days or fourteen days after Michael Giamari was killed. She will tell you that a couple of weeks before she moved, she missed that pistol from under the pillow; she was so concerned about its being gone that she went across the street and spoke about the matter to Carnavalle's mother. But she will tell you that she did not speak to Rocco Carnavalle himself.

"Now, right here, I want to caution you gentlemen that it is a big undertaking for a jury to sit here and listen to a lot of witnesses and determine where the truth is. You must not expect that where twenty or thirty witnesses are called, that they are all going to say exactly the same thing. They are not all going to see or remember things the same. One person remembers things very well, and another man does not observe things closely. Some other person observes closely but readily forgets. Some things make a bigger impression on one man than others. You gentlemen will find that you will remember in the evidence here some things clearly, and you will be surprised to have some other member of the jury say that a witness said some other thing that had escaped your attention. And you have also, as you listen to the witnesses, you have to find out whether that witness has got a motive to conceal anything. So I say we are going to call her; and we expect that you will find in her evidence some corroboration of Joseph La Salle's testimony."

Despite this statement in the opening, no attack at first was made upon the witness' character or credibility, save to show that she had not been living with her husband for nine or ten years, and that she had been intimate with defendant ever since

she knew him. The fact that she was living in adultery with him was undisputed. · She had been examined at length by the prosecutor, and her testimony covers forty-two printed pages, when the following occurred: " Q. How do you fix the time that you moved from New Utrecht avenue? You say you moved on the 22d of March, 1915? A. Yes, sir. Q. How do you get the date? A. Because it was the 20th I had to pay my rent, and it was on a Saturday and I did not pay my rent and I moved out on Monday; I could not move on Sunday. So that is why I know it was the twenty-second. Q. Is there any reason why you did not speak to Rocks when you did not find his gun under the pillow that morning? Mr. Stryker: The same objection to that, your Honor. The Court: Objection sustained. Q. Did you speak to Rocks about missing his gun? A. No. Q. And that you say was about how many weeks before you moved that you missed the gun? A. A few weeks. Mr. Stryker: I object to these questions. Many of them state facts which are not in evidence. The Court: What facts do you refer to? Mr. Stryker: Well, I did not hear the question exactly, but I think he said about, ' The gun.' If he has any evidence that would justify that I withdraw the objection. The Court: Very well. Q. You say a few weeks. Can you remember it any more definitely than that? A. Well, I said a few weeks in the office, too—Mr. Murphy said two weeks. Q. Do you remember what you fixed it at before the grand jury? A. Before the grand jury I fixed it after Mr. Murphy fixed it upstairs. Q. Do you remember what you said to the grand jury? A. A couple of weeks I said. The Court: A couple of weeks before what? The Witness: Before I moved. The Court: A couple of weeks before the 20th of March? The Witness: A couple of weeks before the 22d of March. Q. Have you ever been convicted? A. I was. Q. What were you convicted of? The Court: What is the purpose of this? Mr. Brothers: If your Honor thinks I am out of order — The

Court: As it has not been objected to — Mr. Stryker: It is objected to, your Honor. The Court: Objection sustained, although it comes after the answer is in. Mr. Stryker: And I move to strike out the answer. The Court: The answer is stricken out and the jury are instructed to disregard it as evidence, and it should not be considered by you, gentlemen of the jury."

The earlier part of this testimony was but a repetition of what had been testified to by her some twenty-six pages earlier in the record, and the attack upon her comes, it will be noted, immediately upon her insisting that she had said in the district attorney's office that she had missed the revolver a " few weeks " before March twenty-second, while some one there insisted that it was " two weeks," thus placing its disappearance just before the murder of March eighth with all the significance which would necessarily attach thereto.

The cross-examination of Samuels occupies some thirty pages of the record, during which she reiterated her testimony that the revolver with which the killing was done was not the one which defendant owned. She also testified as to threats made by Joseph La Salle after telephone conversations, that if he could not get out of his trouble he would take everybody with him; and also as to efforts made to get her to change her testimony and to tell the truth as other persons believed it to exist. On redirect examination she was again interrogated at great length as to the identity of the two revolvers in question, and after some eleven pages of effort to shake her testimony, was finally asked: " Q. You had a place? A. Sure. Q. What kind of a place was it? A. A coffee house. Q. A sporting house? A. A sporting house. A. A disorderly house? Mr. Stryker: I object to this, your Honor. The Court: Objection overruled. Mr. Stryker: Exception. A. Yes, sir, it was a sporting house. Q. Now, I must ask you whether you have ever been convicted of a crime or any offense against the law?

A. Yes, sir.  Q. And of what were you convicted?  A. For being on the street—soliciting.  Q. That is, you were soliciting men for immoral purposes were you?  A. Yes, sir.  Q. And how many times were you convicted of that offense?  Mr. Stryker:  Objected to as not competent, relevant or material. The Court:  Objection overruled.  Mr. Stryker:  Exception. A. I was not always convicted for soliciting.  Mr. Stryker: And it is an obvious attempt to impeach his own witness.  The Court:  In view of the present state of this witness' examination, the cross-examination, I think it is proper.  Objection overruled.  Mr. Stryker:  Exception.  Q. You were convicted of soliciting how many times?  A. About twice.  Q. And what other offenses were you convicted of?  Mr. Stryker: The same objection to that, your Honor.  The Court:  Objection overruled.  Mr. Stryker:  Exception.  A. Loitering.  Q. By that you mean upon the street?  A. Yes, sir.  Q. That is, you were convicted of loitering and being a common prostitute, weren't you?  A. Yes, sir.  Q. How many times were you convicted of that?  A. About six or seven times.  Q. How many times have you served a sentence in any prison?  A. As many times as I was convicted.  Q. And about how many times is that?  A. About six or seven times.  Q. When was the last time that you were convicted?  A. Last year.  Mr. Brothers:  That is all."

The appellant contends that the learned trial court committed reversible error in permitting the assistant district attorney to impeach his own witness on redirect examination, after he was disappointed by her testimony on the direct and cross-examination.  The respondent in its brief says:  " Counsel claims that the sole purpose of this evidence was to discredit and impeach the witness.  We concede that, if that was the purpose of the testimony, error was committed in its reception.  We contend, however, that the evidence was not received for that purpose; but merely and solely for the purpose of showing the witness's

past history, in order to enable the jurors to determine the extent to which they should give credit to her testimony. And we submit that a reading of the record will bear out our assertion."

With this contention I cannot agree. A consideration of the course of the examination of this witness shows two distinct and unmistakable efforts to impeach and discredit her, made by the prosecution: First. At the close of her direct examination, when she refused to admit that the defendant's pistol had disappeared two weeks before the murder, insisting it was a few weeks, and that efforts had been made in the district attorney's office to get her to change her testimony; this attempt to impeach her was properly prevented by the learned trial court, who sustained defendant's exception. Second. At the close of the redirect, when the effort was renewed, and this time the learned trial court erroneously overruled the defendant's exception, when nothing occurring in the interim had changed the situation or justified the reversal of the previous ruling.

As I view it, the precise point involved herein was clearly determined in favor of the appellant's contention in People v. Minsky (227 N. Y. 94), where Judge Pound said (at p. 98): "The witness was, however, a necessary and material witness for the People and the defendant complains that the assistant district attorney was allowed to impeach her. The witness proved adverse, if not disappointing. The court, in the exercise of its discretion, properly allowed the district attorney to cross-examine her (People v. Sexton, 187 N. Y. 495, 509), although it does not appear that he was surprised by her failure on the witness stand positively to identify her friend Shuey as the defendant. The testimony was adverse but perhaps not unexpectedly adverse. The district attorney put her on the stand as a hostile witness to get what he could from her. By so doing he did not necessarily present her as a witness of good moral character. The law does not limit a party to witness of good

character, nor does it compel a party to conceal the bad record of his witnesses from the jury, to have it afterwards revealed by the opposing party with telling effect. Such a rule would be unfair alike to the party calling the witness and the jury. Men have been convicted of murder in the first degree by the evidence of admittedly dangerous and degenerate witnesses, law breakers and professional criminals. (People v. Becker, 215 N. Y. 126; 210 N. Y. 274.) But when a disreputable witness is called and frankly presented to the jury as such, the party calling him represents him for the occasion and the purposes of the trial as worthy of belief. In the search for truth he may have to press the witness severely. Even the best of men may be an unwilling witness. But he must not thereafter attack the credibility of the witness by general character evidence tending solely to show him to be untruthful and unworthy of belief. Where the only effect of an affirmative answer to a question asked by a party to his own witness for such purpose will be to discredit the witness, the question is objectionable. (Bullard v. Pearsall, 53 N. Y. 230; Pollock v. Pollock, 71 N. Y. 137, 152.) In this case, the assistant district attorney presented this woman not as a reputable witness, generally speaking, but as one whose evidence might be believed. When he was disappointed, he not only cross-examined her sharply, but also asked her if she was not at the time of the killing a prostitute; soliciting men on the street; having several venereal diseases. To those questions timely objection was made and overruled and exception taken. The court did not compel the witness to answer, and the witness did not answer because she said the answers would disgrace her.

" The court erroneously permitted the assistant district attorney to ask these questions, not by way of introducing a willing witness with an unfortunate past, but for the purpose of discrediting his own witness. The error was not cured by permitting her to refuse to answer. The questions were objectionable

and the objection should have been sustained. That was the right of the defendant. The privilege of the witness is solely for the protection of the witness. It may be claimed or waived as the witness sees fit and the party cannot complain. (Gt. W. Turnpike Co. v. Loomis, 32 N. Y. 127, 138.) To the defendant, the claim of privilege was as prejudicial as an affirmative answer would have been.

" The district attorney put the witness on the stand with the power to destroy her standing for veracity if she spoke against him and to present her testimony as trustworthy if she spoke for him. A party should not be permitted, after having unsuccessfully taken a chance to secure favorable testimony, to attack his own witness and ask the jury to infer the contrary of what has been sworn to, because the falsity of the evidence is to be presumed from the general character of the witness. A witness of bad character has enough to fear from the adverse party without being intimidated by the party calling him. The power to coerce a witness may as reasonably be expected to beget a lie as to force the truth from unwilling lips.

" The jury may have been led to infer that because the People's witness was a bad woman, she saw defendant after Levine was killed, although she denied it. The error, therefore, went to the heart of the People's case. The People were not bound by her denial. They could, without impeaching the witness, ask the jury to infer that she did not tell the whole truth and nothing but the truth. They might have resorted to other proof if other proof was available.

" The district attorney may not now say that he merely sought to show the character of the witness as a part of her history. (People v. Taylor, 36 Hun, 639; 101 N. Y. 608; opinion, 3 N. Y. Crim. Rep. 297, 299.) He said in effect, and properly, when he called the woman: ' This witness is not reputable, but she will now speak truly'; but in the end he shifted the emphasis and said in effect ' she is depraved and

unworthy of belief, and I now ask you not to believe her, but to believe the contrary of her positive assertion.' The purpose of the evidence and the order of the proof, rather than the evidence itself, condemned it."

An examination of the record in the Minsky case shows that the assistant district attorney said in his opening: " I will say right now, that outside of the doctor and the police officer and those of the district attorney's staff who are going to testify here, I do not believe there is a reputable witness in the case; but the jury has got to take into consideration the fact that we have to bring the witnesses who were there in the neighborhood and who know about the matter, and weigh the testimony according to your best judgment."

And again: " And that night, we will show you that the wife of Horowitz—who was out on 14th street for no legitimate purpose—came back to the flat about 12 o'clock."

And again: " That is the People's case. Some of the witnesses we will call are very disreputable, there isn't any doubt about that, but they hung out there and were the associates of the defendant. Some of them are very unwilling witnesses and I ask you to be patient during the examination of these witnesses."

In the Minsky case the direct examination of the witness Horowitz had proceeded some sixty pages before the first attack was made in the effort to impeach her, and it was resumed upon redirect.

For the error in allowing the assistant district attorney to impeach the People's witness Samuels, the judgment of conviction must be reversed and a new trial ordered. It may be remarked at this point that the decision of the Court of Appeals in the Minsky case was rendered in July, 1919, while this case was tried in June, 1915, so that the learned trial court did not have the opinion in the former case for its guidance.

The judgment should be reversed and a new trial ordered.

CLARKE, P. J., and PAGE, J., concur; LAUGHLIN and MER-RELL, JJ., dissent.

LAUGHLIN, J. (dissenting):

I dissent upon the ground that in my opinion the defendant is clearly guilty and that the error was not sufficiently prejudicial to require a reversal. (See Code Crim. Pro. § 542.)

MERRELL, J.:

I concur.

Judgment reversed and new trial ordered. Settle order on notice.